COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Russell and Malveaux
Argued by teleconference

**PUBLISHED**

ADRIAN KNIGHT

v.      Record No. 0323-19-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WILLIAM G. PETTY
APRIL 7, 2020

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John R. Doyle, Judge[1]

James O. Broccoletti (Randall J. Leeman, Jr.; Zoby, Broccoletti &
Normile, P.C., on brief), for appellant.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


In this appeal, we consider whether the trial court erred in denying a motion to suppress

evidence it concluded inevitably would have been discovered by officers after an unlawful search.

For the reasons stated below, we will reverse the judgment of the trial court.

## I.  BACKGROUND

Adrian Knight was charged with possession of a firearm by a convicted felon in violation

of Code § 18.2-308.2 and carrying a concealed weapon in violation of Code § 18.2-308.  Knight

filed a motion to suppress the evidence found during his arrest, arguing the search yielding the

evidence was unlawful.  During a hearing on Knight's motion, the trial court heard testimony

from Officer Michael Santare and Officer Logan Luketic of the Norfolk Police Department and

accepted into evidence the body camera videos of the two officers.

---

[1] Although Judge Doyle entered the sentencing order in this case, the order at issue in this
appeal was entered by Judge Everett A. Martin, Jr.

The officers testified that on January 23, 2018, Officers Santare and Luketic conducted a traffic stop of a car that had no front or back license plates. The only occupants of the car were Knight, who was driving, and a passenger. Knight explained the missing license plates by stating he was a car dealer, the car was not his, he had just bought it at an auction, and he had a temporary dealer tag that must have fallen off. When Officer Santare asked for the car registration, Knight reached into the back seat and retrieved a backpack, which he rummaged in while looking for the registration. Knight produced a driver's license but was not able to find the registration. Officer Santare asked for license plate information, and Knight again rummaged through the backpack while it was on his lap. Again, he was not able to find the information, so Officer Santare wrote down the car's VIN number. Officer Santare told Knight he would be free to go if the information regarding the car was confirmed. Knight replied he would likely park the car nearby because of the missing plates. The officers had stopped the car in a travel lane of a busy street.

Officer Santare and Officer Luketic left Knight and his passenger in Knight's car and returned to the police car to verify the information. Officer Santare testified the officers observed no indication of criminal activity, saw no furtive movements by the occupants, and smelled no drugs in the car. Video from the officers' body cameras shows that while waiting for dispatch to verify the car's registration, the two officers discussed whether, and how, they could search the car for weapons and drugs. Officer Santare suggested that they ask for consent to search the car and if the occupants say "no" then "there's definitely something in that f***ing car." When dispatch notified the officers that Knight had a warrant for failure to pay court costs, Officer Santare pumped his fist in a "yes!!!" gesture. Officer Luketic suggested they could now search the driver's immediate area as a search incident to arrest. Officer Santare responded, "He's the driver, that's the whole car. It sucks to suck." At the suppression hearing, Officer

Santare explained that his statement about searching the whole car meant the officers would have to take an inventory of the vehicle because the car would have to be towed. Officer Santare also testified that in conducting the inventory search, "there would be a decent likelihood that there could be a weapon in the vehicle, so that's kind of what would be on [their] minds" while searching the car.

Officer Santare ordered Knight out of the driver's side of the car, handcuffed him, and searched his pockets. In one pocket there was about $1000 in cash. Officer Santare informed Knight that they were verifying the warrant information and, if the warrant was still active, they would arrest him. Officer Santare offered Knight the option of having the passenger take possession of the cash. Knight accepted the option, and the cash eventually was given to the passenger. Knight protested that he knew of no warrant, and Officer Luketic assured Knight from the passenger side of the car that they were verifying the warrant because sometimes it is not removed from the system. Nevertheless, as soon as Knight was placed behind his car, Officer Luketic moved to the driver's side to begin searching. Knight protested the search of his car, but Officer Santare told him the car was being searched because it needed to be towed. Knight again protested the search and asked if someone could just move the car to a parking place. Knight again objected from where he stood handcuffed behind the car. Officer Luketic paused to yell, "Are you going to tell me how to do my job?" He then leaned into the car and began searching.

Officer Luketic first pulled up the driver's side floor mat and looked underneath. Then he reached under the front driver's seat. Officer Santare had placed the small items from Knight's pocket on the driver's seat. Officer Luketic moved those items to the floor—without inventorying them—and searched the folds of the seat. Officer Luketic rechecked under the floor mat and driver's seat. He then rifled through the contents of the center console. He opened

a file folder that was between the seats, flipped through the contents, and then reached between the seats. He examined the folds and seams of the cloth cover on the passenger seat, including turning it inside out and carefully squeezing the folds. He emptied a large envelope of car parts, and then placed the items back in the envelope. At no time during this search did he record the contents of the car. Officer Luketic then reached into the back seat and grabbed Knight's backpack. He unzipped the backpack and found a gun inside. After he radioed his partner and secured the gun, he continued to search the rest of the car. Other than the gun, no contraband was found in the car.[2]

Officer Santare, who had not participated in the search, completed a PD Form 924 "Vehicle Tow/Impound Record." On the form, classification of tow is marked as "prisoner's vehicle" and not "traffic hazard." The only things listed in the inventory section of the form are "laptop" and "various tools." The back of the form directs that the officer will "read [the options listed] to operator who will sign the front of the form." The options include towing by a wrecker of operator's choice, leaving the vehicle legally parked, or leaving it in the care of a responsible licensed driver. It also has an option to indicate the operator refused or was unable to choose an option. The form stated that "[v]ehicles towed to the [police department] compound will be inventoried in accordance with this order." No option was selected, and Knight did not sign the front of the form.

In their testimony, both officers justified the search of the car as an inventory search prior to towing the car; both officers also admitted they listed the search as "incident to arrest" in their report summaries. Both officers testified they had the discretion to move the car to a safe parking place. Officer Santare testified it is not against departmental policy for someone to

---

[2] Our analysis is not concerned with the invasive search done after the point the gun was discovered.

move the car from its location to a legal parking space. He testified, "It's not against departmental policy. However, there is nowhere it states that I have to do that." He added that he would have had to drive the car "halfway around the block to park it." Officer Luketic testified that there was a parking lane on the opposite side of the road, but not on the side the car was parked. In answer to a question by the trial court, Officer Santare testified that departmental policy gives discretion to the arresting officer whether to have the car towed or parked in a safe place off the traveled portion of the road.

Knight did not call witnesses during the hearing but entered into evidence the Norfolk Police Department's towing and inventory policy (NPD inventory policy). The NPD inventory policy gives three options to a driver who is arrested and whose vehicle is *not* a traffic hazard, including the option to properly park the car. The NPD inventory policy also states, "Any vehicle towed . . . as a traffic hazard will be inventoried by the wrecker driver if entry is accessible." In a separate section, the NPD inventory policy covers inventory procedures. It states, "An inventory is an administrative process by which property within an impounded vehicle is listed, secured, and protected. It will not be used as a substitute for a search warrant." The inventory procedure directs that "[w]hen an officer discovers any firearm(s) or money in excess of $5.00, this property will be vouchered and listed on inventory."

After both the hearing, which included extensive argument by counsel, and additional briefing by both parties, the trial court denied Knight's motion. It first concluded there was no probable cause to search Knight's car. It then found "the inventory search was motivated by a desire [by the officers] to investigate." The trial court observed that the officers "wanted to search [Knight's] car" and that the "reaction of the officers to the news there was an outstanding warrant for Knight can best be described as joyful." The trial court noted the discussion between the officers of how and to what extent they could conduct a search. Once Knight was taken into

custody, the search of the car looked more like an investigation than an inventory. The trial

court noted that the NPD inventory policy "provides a PD Form 924 will be prepared when an

inventory is conducted." Nevertheless, the court found "Officer Luketic's video show[ed] he

was not completing the PD 924 as he conducted the search, nor calling out what he found."

Moreover, the trial court found both that the officer that conducted the search was not the officer

that completed the form and that the form failed to list three valuable items. The court noted that

failure to list one of those items, the gun, violated section XI(D) of the NPD inventory policy.

Overall, the trial court found that compliance with the NPD inventory policy could "aptly be

described as slipshod."

After finding the officers' search of Knight's car was motivated by an investigatory

motive, the trial court nonetheless denied Knight's motion to suppress. The trial court reasoned

that the car would likely have been impounded because the driver was being arrested and the

passenger had no driver's license. The trial court then reasoned that if it were impounded, an

inventory would be completed and the gun inevitably would be found.

Knight entered a conditional plea of guilty, reserving the right to challenge on appeal the

trial court's denial of his motion to suppress and to withdraw his plea if successful. The

Commonwealth consented to this conditional plea and the trial court approved it, as required by

Code § 19.2-254. Upon entering this conditional plea, Knight was found guilty of possession of

a firearm by a convicted felon in violation of Code § 18.2-308.2 and carrying a concealed

weapon in violation of Code § 18.2-308.

## II. ANALYSIS

Knight argues the trial court erred when it denied his motion to suppress evidence found

during an invalid search of his car. "In reviewing a trial court's denial of a motion to suppress,

'we determine whether the accused has met his burden to show that the trial court's ruling, when

the evidence is viewed in the light most favorable to the Commonwealth, was reversible error.'"

Cantrell v. Commonwealth, 65 Va. App. 53, 56 (2015) (quoting Roberts v. Commonwealth, 55

Va. App. 146, 150 (2009)). This Court is "bound by the trial court's findings of historical fact

unless 'plainly wrong' or without evidence to support them and we give due weight to the

inferences drawn from those facts by resident judges and local law enforcement officers." Id.

(quoting McGee v. Commonwealth, 25 Va. App. 193, 198 (1997) (*en banc*)). "However, we

consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the

officers unlawfully infringed upon an area protected by the Fourth Amendment." Id. (quoting

Hughes v. Commonwealth, 31 Va. App. 447, 454 (2000) (*en banc*)).

## A. Inventory Search

The trial court concluded that the search of Knight's car was not a valid inventory search

because although the car could be lawfully impounded, the motivation for the search was

improper because it was for an investigative purpose.[3] We agree.

---

[3] Knight additionally argued that the trial court erred when, in its letter opinion, it specifically held Knight's car was lawfully impounded. Both parties relied on King v. Commonwealth, 39 Va. App. 306, 311 (2002), for the proposition that the "validity of the impoundment is a question separate from the validity of the subsequent inventory search and must be determined first." King, and the cases it relied on, analyzed the search as a sequential event where there was an impoundment and "subsequent inventory search." Where, as here, the search occurs before impoundment, we see no reason the lawfulness of the search cannot be addressed as the dispositive issue. The rule remains that "[a] *routine* inventory search of a lawfully impounded vehicle conducted pursuant to standard police procedure is reasonable under the Fourth Amendment *unless* it is 'a pretext concealing an investigatory motive.'" Id. (emphasis altered). Here, the search violated two of the three requirements established in Cantrell, 65 Va. App. at 60, for a lawful inventory search. Thus, we decline to decide today whether Knight's car was lawfully impounded because that determination does not affect our conclusion that the inventory exception to the warrant requirement does not apply here. See Reese v. Commonwealth, 220 Va. 1035, 1039 (1980).

Since we decline to address whether Knight's car was lawfully impounded, we additionally do not need to address the Commonwealth's argument that this assignment of error was not preserved for appeal pursuant to Rule 5A:18.

"Searches and seizures conducted without a warrant are presumptively invalid." Cantrell, 65 Va. App. at 59. However, this Court has recognized,

> Under the community caretaker exception, the police may conduct a warrantless inventory search of a vehicle only if the following conditions are met: "1) the vehicle must be lawfully impounded; 2) the impoundment and subsequent search must be conducted pursuant to standard police procedures; and 3) the impoundment and subsequent search must not be a pretextual surrogate for an improper investigatory motive."

Id. (quoting Williams v. Commonwealth, 42 Va. App. 723, 731 (2004)). "[T]he inventory exception does not apply when the inventory is merely 'a pretext concealing an investigatory police motive.'" Reese v. Commonwealth, 220 Va. 1035, 1039 (1980) (concluding the inventory exception did not apply where the motive prompting the search was "manifestly" shown to be investigatory when, "[w]ithout preparing a list of the contents of the car, the officers simply seized what they were seeking"); Florida v. Wells, 495 U.S. 1, 4 (1990) ("An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

Here, the trial court found the search was merely a pretext concealing an investigatory motive by the officers, who wanted to search the car for contraband.[4] See Wells, 495 U.S. at 4. The evidence supports this factual finding. The body camera video shows the officers discussing ways they could justify a search. The trial court found the "reaction of the officers to the news there was an outstanding warrant for Knight can best be described as joyful." One officer

---

[4] The trial court preliminarily concluded the search could not be justified by probable cause. An officer may "search a vehicle involved in a traffic stop so long as the officer has probable cause to do so." Curley v. Commonwealth, 295 Va. 616, 621 (2018). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (quoting Jones v. Commonwealth, 277 Va. 171, 177-78 (2009)). Before this Court, the Commonwealth did not argue probable cause existed to search the car. Based on a *de novo* review of the evidence, including the body camera video of the two officers, we agree there was not probable cause to believe there was contraband or evidence of a crime in the vehicle.

pumped his fist in a gesture of success. The officers discussed between themselves that Knight and his passenger were "the type" to be engaged in criminal activity. Officer Luketic explained during hearing testimony that they "can tell by how nervous someone is or the look," such as being "flashy" by wearing "headphones while driving, the attitude . . . and appearance, . . . like the way [Knight] like carried himself." The officers, however, did not notice any indication of drugs in the car. Nor did they notice any "furtive movements" or unusual nervousness on the part of the car's occupants.

The investigative motive is clearly seen in the video of Officer Luketic's search. The officer made no attempt to prepare a list of the contents of the car while he was searching. See Reese, 220 Va. at 1039. Rather than inventory the visible contents of the car, Officer Luketic first pulled up the driver's side floor mat, reached under the driver's seat, rifled through the contents of the center console, checked between the seats, checked in the folds and seams of the passenger car seat cover, and completely emptied a large envelope of car parts. At no point during the search did Officer Luketic attempt to record the inventory. Nor did he call out the contents to another officer to record, even though there were several other officers standing nearby. The places initially searched by the officer were indicative of "a pretextual surrogate for an improper investigatory motive." Cantrell, 65 Va. App. at 60.

Moreover, the trial court had the "opportunity to look the witnesses [officers] in the eye and weigh their credibility," Malbrough v. Commonwealth, 275 Va. 163, 171 (2008), as they testified regarding their motivation to search. Each tried to explain the conversations between them, preserved on the body camera videos, regarding how to accomplish a search. Each tried to explain why they listed the car search in their report summaries as "incident to arrest" rather than as an inventory search incident to towing. Officer Santare testified as to his reasons for filling out the form as "officer tow" of a "prisoner vehicle" rather than tow of a "traffic hazard." As

with any other witness, determining the credibility and weight of an officer's testimony often "involve[s] consideration of nuances such as tone of voice, facial expression, gestures and body language seldom discernable from a printed record." Id. Because it is supported by evidence in the record, we accept the trial court's finding that "the inventory search was motivated by a desire to investigate."

Furthermore, the search was not "conducted pursuant to standard police procedures" Cantrell, 65 Va. App. at 60. The trial court's finding of an improper investigatory motive in and of itself renders the search contrary to the NPD inventory policy, which expressly states that an inventory "will not be used as a substitute for a search warrant." The "inventory procedure" section of the NPD inventory policy requires a "PD Form 924 [to] be prepared when an inventory is conducted." The form, however, was not prepared at the time the search was conducted and was not prepared by the officer who conducted the search. Most of the items in the car were not listed on the inventory, including a generator in the trunk, large cardboard packages, auto parts, and a milk crate of smaller containers. Likewise, neither the backpack nor the gun was inventoried as either "remaining in the car" or "vouchered property sent to Property and Evidence." Failure to inventory the gun was a violation of an explicit requirement of the NPD inventory policy. The vehicle owner's signature line and the check boxes on the back of the form were not completed as required by the instructions on the back of the PD Form 924. Thus, there was no indication Knight was given an option as to the disposition of his car. In sum, the officers' attempt to comply with established procedures was at best "slipshod."

Accordingly, the search of Knight's car does not fall under the community caretaker inventory exception because regardless of whether it was lawfully impounded, the search was not "conducted pursuant to standard police procedures" and was a "pretextual surrogate for an improper investigatory motive." See Cantrell, 65 Va. App. at 60. As a result, we agree with the

trial court that this was an investigatory search and not one conducted pursuant to the Norfolk Police Department policy.

## B. Inevitable Discovery

Having concluded that the evidence at issue here was discovered through unlawful means, we must determine whether the trial court erred in admitting the evidence nonetheless. Ordinarily, evidence obtained as the result of an unlawful search is subject to suppression under the exclusionary rule. Commonwealth v. Jones, 267 Va. 532, 535 (2004).

> [The exclusionary] rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures: "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." United States v. Calandra, 414 U.S. 338, 347 (1974). Accordingly, when the police discover evidence during an unreasonable search or seizure, the exclusionary rule generally prohibits the use of such evidence at trial.

Freeman v. Commonwealth, 65 Va. App. 407, 419-20 (2015).

"However, not all illegally obtained evidence is subject to suppression. One of the exceptions to the exclusionary rule is the doctrine of inevitable discovery." Jones, 267 Va. at 535 (citations omitted). "Under this exception to the exclusionary rule, evidence obtained by unlawful means is admissible if that evidence or information 'ultimately or inevitably would have been discovered by lawful means.'" Carlson v. Commonwealth, 69 Va. App. 749, 763 (2019) (quoting Jones, 267 Va. at 536). "The inevitable discovery rule is 'an off-shoot of the independent source doctrine.'" Copeland v. Commonwealth, 42 Va. App. 424, 437 (2004) (quoting Wilkins v. Commonwealth, 37 Va. App. 465, 475 (2002)). Thus, to establish the exception, the Commonwealth must show "'(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct' and

'(2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct.'" Carlson, 69 Va. App. at 763 (quoting Jones, 267 Va. at 536).  Moreover, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Id. at 765 (quoting Nix v. Williams, 467 U.S. 431, 444 n.5 (1984)).  As a result, the inevitable discovery rule is most likely to be applied "if [alternative] investigative procedures were already in progress prior to the discovery via illegal means, as in Nix v. Williams, or where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later."  6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4(a), at 363-64 (5th ed. 2012); United States v. Hodge, 714 F.3d 380, 387 (6th Cir. 2013) ("This burden is met if the government shows 'that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.'" (quoting United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999))).

The Commonwealth argues Knight's firearm would have been inevitably discovered when the car was inventoried subject to being towed.  The Commonwealth suggests that because the officers could have lawfully impounded the car, and the car would have been searched incident to the towing, then the evidence should be admitted under the inevitable discovery doctrine.  But the question before us is *not* whether the officers had discretion to tow Knight's car or whether the officers could have found a lawful way to search Knight's car.  At this stage of the analysis, the question is whether the circumstances were such that, "pursuant to some standardized procedures or established routine," the search "would *definitely* have occurred later."  See Carlson, 69 Va. App. at 765 (emphasis added); Hodge, 714 F.3d at 387; LaFave,

- 12 -

supra, at 364. The question is not whether an inventory search might have happened, but whether the finding of the gun was inevitable.

The trial court erred in concluding the backpack would have inevitably been searched and the firearm found. Here, there was no "independent source" separate from the officers' unlawful search that would have inevitably led to the discovery of the firearm. See Copeland, 42 Va. App. at 437. The record indicates two reasons no independent search would have discovered the firearm apart from Officer Luketic's unlawful search. First, the NPD inventory policy requires that "[w]hen a police officer seizes, tows, or otherwise removes a vehicle from the owner's custody, the officer will conduct *an inventory* of its contents, unless entry to the vehicle cannot be gained." (Emphasis added.) The policy provides for *one* inventory, at the time the vehicle is removed from the owner's custody and by the officer authorizing the tow. Nothing in the record suggests that after Officer Luketic completed his unlawful search, a separate and independent inventory would have been performed. In fact, no subsequent inventory would have been necessary because all the contents of the car had been examined during the unlawful search. Second, Officer Luketic removed the backpack and gun from the car during his unlawful search and kept them in his possession. Thus, there would have been no motivation to conduct a subsequent lawful inventory.

Likewise, the record does not show that the gun would have inevitably been inventoried pursuant to a tow of the vehicle if the officers had not had an improper motive to search the car. Both officers testified that when the driver of a car is arrested and the car is improperly parked, an officer has discretion to move the vehicle to a legal parking place. Officer Santare testified he had, in the past, driven an accused's vehicle to a lawful parking place rather than have it towed. The officers also testified that parking was available on the access street adjacent to the place Knight's car was stopped and on the left side of the road where the car was stopped. Knight

asked if someone could move the car to a lawful parking location, but the officers refused. Certainly, neither Officer Santare nor Officer Luketic, nor any of the other officers who arrived at the scene prior to the unlawful search, were required to move the car off the street as Knight requested. But each of those officers had the discretion to do so. Thus, if the officers had not had an unlawful investigatory motive and desire to search Knight's car, one of them might have moved the car to a lawful parking place rather than have the car towed. If Officers Santare and Luketic declined to move the car, one of the other officers on the scene might have done so. Although Knight's passenger did not have a driver's license, Knight or his passenger might have been able to call another driver or request help from a bystander to move the car out of the lane of traffic. If the car had been lawfully parked, the officers would not have needed to inventory the car because it would not have been removed from Knight's custody.

Moreover, the NPD inventory policy requires a PD Form 924 to be completed. That form requires the officer to read several options to the owner of the car, who then signs the form. Here, neither officer read the options to Knight or asked him to sign the form. The first option is for the owner or driver of the car to procure his own tow wrecker. Since Knight's car was not evidence of a crime, it did not need to be impounded. Knight could have arranged for the car to be towed to his home, a business, or another location. Because the NPD inventory policy provides that an inventory is to be conducted on cars towed to the police compound, cars towed elsewhere would not need to be inventoried by the officers. In addition, the NPD inventory policy provides that if the car is towed because it is a traffic hazard then the tow truck operator will perform the inventory. If Knight had arranged his own towing, no inventory search would have been required by the officers, and the firearm would not inevitably have been discovered.

Even beyond that, it was not inevitable that the backpack would have remained in the car. Although the passenger was not licensed to drive the car to a lawful parking area, he was

competent to safeguard Knight's belongings. Officer Santare had already asked Knight if he wanted the passenger to take possession of the cash in Knight's pocket, and Knight had agreed. Officer Santare testified there was no reason the passenger was not capable of taking the laptop and backpack as well as the cash. Thus, if the officers had not been motivated by a desire to search for contraband rather than inventory the car, the passenger might have taken possession of the backpack, paperwork file, and laptop computer in addition to the cash. In such a case, an inventory pursuant to the tow would not have included the backpack because it would not have remained in the car.

In summary, the record before the trial court does not show that the gun in this case would have *inevitably* been discovered if the officers had not had an investigatory desire to search the car. Although the gun *could* have been subsequently found, it would require speculation to conclude it inevitably *would* have been found. See Carlson, 69 Va. App. at 765 ("inevitable discovery involves no speculative elements"). Having found the search of Knight's car was unlawful, the trial court erred in relying on the inevitable discovery exception to deny Knight's motion to suppress the evidence.

Lastly, we observe that "[t]he exclusionary rule is a self-limiting, 'prudential' doctrine whose 'sole purpose . . . is to deter future Fourth Amendment violations.'" Collins v. Commonwealth, 297 Va. 207, 214 (2019) (quoting Davis v. United States, 564 U.S. 229, 236-37 (2011)). When, as here, police officers deliberately attempt to subvert the protections afforded by the Fourth Amendment, we can think of no more appropriate action to deter future officer misconduct than suppression of the unlawfully discovered evidence.

Knight "entered a conditional guilty plea pursuant to Code § 19.2-254, which provides in part that '[i]f the defendant prevails on appeal, he shall be allowed to withdraw his plea.'" Hasan v. Commonwealth, 276 Va. 674, 681 (2008). Knight has prevailed on appeal regarding

- 15 -

suppression of the evidence at issue in this case. "He is entitled by statute to withdraw his plea. [Knight] must be given the opportunity to reassess the admissible evidence that may be used against him and, if the Commonwealth wishes to continue its prosecution, demand a trial if he so desires." Id.

## III. CONCLUSION

Because the Commonwealth failed to prove the gun inevitably would have been discovered through a subsequent lawful inventory search, we conclude the trial court erred in denying Knight's motion to suppress the evidence found during the unlawful search. Accordingly, we reverse that decision, and we need not address Knight's second assignment of error that his car was unlawfully impounded. We remand in accordance with the principles expressed in this opinion.

Reversed and remanded.